UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————

ROBERT CARDEW and
BARRY ARKIM,

                              Plaintiffs,


  v.                                              9:09-CV-775
                                                  (GLS/ATB)

JOSEPH F. BELLNIER, *et al.,*


                              Defendants.

———————————————————————

ROBERT CARDEW, 82-C-0739
BARRY ARKIM, 91-B-0146
Plaintiffs, *pro se*

DEAN J. HIGGINS
Assistant Attorney General

ANDREW T. BAXTER, United States Magistrate Judge

### <u>REPORT AND RECOMMENDATION</u>

        This matter was referred by U.S. District Judge Gary L. Sharpe, for Report

and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y.

72.3(c).  The case was transferred to me on January 4, 2010, following the

retirement of U.S. Magistrate Judge Gustave J. Di Bianco.  (Dkt. No. 52).

        In this civil rights complaint, plaintiffs allege that defendants have

implemented a policy of segregation in double occupancy housing assignments

that violates the Equal Protection Clause and the right to practice one's religion as

protected by the First Amendment.  Plaintiffs also argue that defendants' policy of serving "non-red-meat meals" on Fridays during Lent and the Catholic holiday of Ash Wednesday, compels plaintiffs, who are not Catholic, to participate in a "Catholic Religious Dietary Ritual" in violation of the First Amendment and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. §§ 2000cc-2000cc-5.  Plaintiffs seek significant monetary damages, as well as injunctive relief.

Presently before the court is defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  (Dkt. No. 107).  For the following reasons, this court concludes that defendants' motion as to plaintiffs' Equal Protection claim should not be granted in its entirety.  However, defendants' dietary policy did not violate plaintiffs' rights under the First Amendment or under RLUIPA.  Accordingly, this court recommends granting defendants' motion in part and denying it in part.

## I.   **Facts and Contentions**

### A.   **Double Bunking Policy**

Plaintiff Cardew was transferred to Upstate Correctional Facility (Upstate) on January 11, 2008, where he was provided with a medical permit for a bottom bunk.  Plaintiff Cardew alleges that he was told that he would be placed in a Double Occupancy Housing Unit (DOHU) by himself because there was no other inmate who fit the Department of Correctional Services (DOCS) DOHU policy for

sharing a cell with plaintiff Cardew.  (Compl. ¶¶ 44–45).  Cardew alleges that he was advised that there was no other inmate of Cardew's race who weighed as much as Cardew, with whom he could be double-celled.  (Dkt. No. 107-3 at 5–6).[1] Cardew submitted a grievance (Grievance No. UST-34086-08), alleging that the DOHU policy was discriminatory because race and physical size were used as criteria for DOHU assignments.  *Id.*

An investigation was conducted on January 17, 2008, which reported that Cardew's "assessment has been completed and, *due to safety and security reasons*, [Cardew] has been single celled."  (Dkt. No. 107-3 at 9) (emphasis added).  The Inmate Grievance Review Committee (IGRC) denied Grievance No. UST-34086-08 on January 24, 2008, stating that "Albany Central Office of Classification & Movement shall be responsible for the selection of inmates for double cell

---

[1] In their complaint, plaintiffs present their facts, organized by the grievances they submitted and the responses they received, rather than by specific events.  Plaintiffs consistently refer to grievances by number, but do not attach them to their complaint.  Instead, they attach some of their grievance records to their "Motion to Dismiss Affirmative Defenses" (Dkt. No. 76), and some of their grievance records to their Memorandum of Law in Response to Defendants' Partial Motion to Dismiss (Dkt. No. 123).  The court will refer to these grievance records as "Plaintiffs' Exhibits," utilizing the exhibit number designated by the plaintiffs (exhibits attached at Dkt. No. 76 are numbered 1–46 and exhibits attached at Dkt. No. 123 are lettered A–H). Defendants attached two exhibits to their motion for judgment on the pleadings, DOCS Directive # 4003 (Dkt. No. 107-2) and the grievance history for Grievance No. UST-34086-08 (Dkt. No. 107-3).  These were not included in plaintiffs' filings, but Grievance No. UST-34086-08 forms the basis of Cardew's arguments related to his housing assignment at Upstate, and plaintiffs refer to Defendants' exhibits in their Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss.  (Dkt. No. 123 at 7).  Defendants did not number the pages of the exhibits attached to their motion, so the court will refer to the exhibits attached to their motion by docket number and page number as assigned by the Case Management/Electronic Case File (CM/ECF) system.

housing." (Dkt. No. 107-3 at 7). Cardew appealed this decision to the Superintendent. *Id*. Superintendent Woods denied Cardew's appeal of Grievance No. UST-34086-08 on January 29, 2008, indicating that "cell assignments are made at the discretion of security staff" according to criteria found in the Special Housing Unit (SHU) Manual, and "this procedure will not be changed." (Dkt. No. 107-3, p. 8). Cardew appealed the superintendent's decision on Grievance No. UST-34086-08 to the Central Office Review Committee (CORC). The CORC's decision affirmed the denial of the grievance and noted that Upstate's "SHU Manual clearly indicates that it is not necessary that inmates share the same ethnic or religious background in a double cell." (Dkt. No. 107-3 at 1).

On December 30, 2008, Cardew was transferred to from Upstate to Wende Correctional Facility (Wende), and was initially placed in a DOHU with an inmate of another ethnic and religious background. (Compl. ¶ 55). However, the next day, on December 31, 2008, Cardew was removed from his DOHU and placed in a Single-Occupancy Housing Unit (SOHU), after staff allegedly told him he could not share a cell with an inmate of another ethnic and religious background. (Compl. ¶ 56).

On February 4 and 13, 2009, plaintiffs Cardew and Arkim submitted individual "volunteer to double cell" requests, which were denied on February 25, 2009. (Compl. ¶¶ 56–57). Cardew filed a grievance (Grievance No. WDE-30294-09) on February 25, 2009, alleging that he was again the victim of

4

discrimination due to the denial of the double cell request.  (Compl. ¶ 59).  The IGRC denied Grievance No. WDE-30294-09 on March 2, 2009, stating that the IGRC could not advise security on how to house inmates.  (Compl. ¶ 60).  Cardew appealed the decision to Superintendent Kirkpatrick, who denied the appeal of Grievance No. WDE-30294-09 on March 5, 2009, stating that the double cell request was denied because Cardew was *over the size limit* for a DOHU.  (Compl. ¶ 61; Pls.' Ex. 4).  The CORC upheld the superintendent's determination, stating that "although the grievant meets the physical size[2] requirements to be double celled," the Deputy Superintendent for Security "appropriately utilized his discretion" when he disapproved Cardew's request to double cell, and that "[t]here is no evidence of racial or religious discrimination . . . this decision was based upon the *grievant's extensive disciplinary history and several placements in protective custody* . . . grievant is not entitled to be housed in the cell of his choice."  (Pls.' Ex. 5) (emphasis added).

Arkim submitted his own grievance (Grievance No. WDE-30401-09) on March 9, 2009, alleging discrimination on the basis of ethnicity and religion as to the denial of a DOHU for himself and Cardew.  (Compl. ¶ 62).  Plaintiffs claim that on March 12, 2009, the IGRC recommended that Arkim and Cardew should

---

[2] The Double-Cell Information Sheet dated January 11, 2008, while Cardew was housed at Upstate, indicates a weight of 341 pounds for Cardew.  (Dkt. No. 107-3 at 11).  By December 29, 2008, when he was transferred to Wende, Cardew had lost 96 pounds, thus meeting the weight criterion for receiving a DOHU.  (Compl. ¶ 117).

be allowed to be placed in a DOHU together.  (Compl. ¶ 64).

Cardew submitted another grievance (Grievance No. WDE-30390-09) on March 10, 2009, alleging that defendant Kirkpatrick "intentionally lied" when he denied the appeal of Grievance No. WDE-30294-09, and stated that Cardew was over the size limit to be placed in a DOHU.  (Compl. ¶ 63).  Superintendent Kirkpatrick personally interviewed Cardew on March 16, 2009, and told him that *security concerns* were the reason for denying Grievance No. WDE-30294-09 and for the denial of a DOHU assignment.  (Compl. ¶ 65).  Superintendent Kirkpatrick also explained that the DOHU criteria, which include consideration of ethnicity and religion, are under the discretion of defendants Sticht (Deputy Superintendent for Security at Wende), Kearney (Corrections Captain at Wende), and Casaceli (Corrections Captain at Wende).  (Compl. ¶ 65).  After his conversation with Superintendent Kirkpatrick, Cardew submitted another grievance (Grievance No. WDE-30447-09) on March 17, 2009, again alleging discrimination.  (Compl. ¶ 66).  On March 19, 2009, Superintendent Kirkpatrick denied Grievance No. WDE-30390-09.  (Compl. ¶ 67; Pls.' Ex. 10).

Cardew appealed the superintendent's decision on Grievance No. WDE-30294-09 to the CORC.  The CORC upheld the superintendent's decision on April 8, 2009, stating that there was no evidence of racial or religious discrimination, and that Deputy Superintendent Sticht exercised his discretion in denying a DOHU to Cardew and Arkim, notwithstanding that Cardew now met the physical

6

criterion for DOHU placement.  (Compl. ¶ 71; Pls' Ex. 5).  The CORC also stated that the request was denied "*based upon the grievant's extensive disciplinary history and several placements in protective custody*."  *Id.*  (emphasis added).  On April 22, 2009, the CORC upheld the superintendent's determination of Grievance No. WDE-30390-09, reciting the same reasons included in their denial of Grievance No. WDE-30294-09.  (Compl. ¶ 72; Pls.' Ex. 11).

Superintendent Kirkpatrick allegedly reversed[3] the IGRC's recommendation to Arkim's Grievance No. WDE-30401-09 that Arkim and Cardew be allowed to double cell on March 20, 2009, indicating that Cardew and Arkim's double housing request was denied for safety and security reasons.  (Compl. ¶ 68; Pls.' Ex. 7).  Arkim appealed the superintendent's decision of Grievance No. WDE-30401-09 to the CORC, who upheld the superintendent's decision on April 22, 2009, stating that the Deputy Superintendent for Security appropriately utilized his discretion in denying Cardew and Arkim a DOHU assignment due to *safety and security reasons* and that the CORC was not presented with sufficient evidence of racial or religious discrimination.  (Compl. ¶ 73; Pls.' Ex. 8).

On March 26, 2009, the IGRC denied Cardew's Grievance No. WDE-30447-09, stating that DOHU assignments are made at the discretion of Deputy Superintendent Sticht.  (Compl. ¶ 69).  Cardew appealed the decision of the IGRC

---

[3] Plaintiffs characterize Superintendent Kirkpatrick's action as "reversing" the IGRC's recommendation, but the Superintendent's decision only states that the grievance is denied.

on Grievance No. WDE-30447-09 to the superintendent, who denied the appeal on April 3, 2009, indicating the denial was due to *security reasons*.  (Compl. ¶ 70; Pls.' Ex. 12).  Cardew appealed, and the CORC upheld the superintendant's decision on Grievance No. WDE-30447-09 on May 6, 2009, repeating the same reasoning given in their decision on Grievance No. WDE-30294-09, *and* citing their decision on Grievance No. UST-34086-08, again reaffirming that due to Cardew's "*extensive disciplinary history and several placements in protective custody*," he was placed in a single cell for "*safety and security reasons*."  (Compl. ¶ 74; Pls.' Ex. 13) (emphasis added).

On May 6, 2009, Captain Casaceli allegedly sent Arkim a memo, which stated that if Arkim would change his program assignment, Casaceli would grant him a DOHU with Cardew.  (Compl. ¶ 75).  Captain Casaceli allegedly then sent Arkim another memo on May 15, 2009, indicating that Arkim and Cardew would not be granted a DOHU together, and instructed Arkim to retain his program assignment.  (Compl. ¶ 75).

For their first cause of action, plaintiffs contend that the above history constitutes evidence of a policy and practice of discrimination in DOHU assignments based on ethnicity and religion in violation of the Equal Protection Clause.  Plaintiffs' second cause of action claims that, because the determination of whether two inmates may be double-celled includes a consideration of their religious affiliations, the policy also violates the Establishment Clause.  Plaintiffs

allege that the policy has the effect of "endorsing religion over non-religion, and giving preferential treatment over other religions and non-religion." (Compl. ¶ 84).

## B.    Dietary Policy

Plaintiffs' third and fourth causes of action are based on DOCS' alleged dietary practices. Cardew submitted Grievance No. UST-34303-08 on February 4, 2008, while he was still at Upstate. (Compl. ¶ 86). The grievance was based on an alleged change in the menu for February 6, 2008. (Compl. ¶ 86). Plaintiffs claim that there was no red meat on the February 6, 2008 menu, because it was Ash Wednesday. (Compl. ¶ 86–87). Red meat was also missing from the menu on every Friday that year during the Lenten season. (Compl. ¶ 86–87).

The IGRC denied Cardew's Grievance No. UST-34303-08 on February 14, 2008, indicating that Ash Wednesday is a "major holiday" like July 4 or Labor Day. (Compl. ¶ 88). On February 22, 2008, Superintendent Woods denied Cardew's appeal of Grievance No. UST-34303-08, indicating that "the holidays that are listed on the menu are the same major holidays that are listed on a regular calendar. For example[,] Ash Wednesday, Thanksgiving, July 4, Labor Day, etc.," and that the same menu that was served on Ash Wednesday was also served on other dates. (Compl. ¶ 90; Pls.' Ex. 15). The Deputy Commissioner for Program Services, defendant Perlman, told Cardew in a letter dated February 21, 2008, that defendant Dean, the Director of Nutritional Services, is in charge of DOCS'

statewide menu, and that Cardew's complaint was referred to him.  (Compl. ¶ 89;
Pls.' Ex. 41).  Defendant Dean notified Cardew by letter, stating that the Ash
Wednesday meal has been the same for many years.  (Compl. ¶ 91).  Cardew
appealed the superintendent's decision to the CORC, who affirmed the
superintendent's decision on March 26, 2008.  (Compl. ¶ 92; Pls.' Ex. 16).

Cardew filed a similar grievance (Grievance No. WDE-30296-09) the next
year on February 24, 2009, while he was at Wende, complaining that the DOCS
statewide menu required all inmates to "participate in the Catholic religious
dietary ritual of not eating red meat on the first day of Lent and they [are] not
given the option of opting out."  (Compl. ¶ 93).  On March 4, 2009, the IGRC
stated that the local food service administrator has no control over the statewide
menu, and food comes from the Food Production Center.  (Compl. ¶ 95).  The
IGRC allegedly also noted that if the menu was changed to accommodate the
Catholic tradition of no red meat on Ash Wednesday, then "at least through
appearances," DOCS would be showing preference for the Catholic religion.
(Compl. ¶ 95).  Superintendent Kirkpatrick denied the appeal of Grievance No.
WDE-30296-09 on March 5, 2009, citing the CORC response to Grievance No.
UST-35637-08 and stating that "there is no indication on the menu that red meat is
not served on Fridays because of the Catholic religion."  (Compl. ¶ 96; Pls.' Ex.
18).

The Deputy Commissioner for Program Services, defendant Perlman, sent

Cardew a letter dated March 12, 2009, indicating that the Office of Nutritional Services "attempts to accommodate the majority of the population observances on major holidays and religious days such as Christmas and the Fourth of July" and referred Cardew to defendant Schattering, the Director of Nutritional Services. (Compl. ¶ 97; Pls.' Ex. 43).  The CORC affirmed the superintendent's decision on Grievance No. WDE-30296-09, citing a recommendation from the Director of Nutritional Services, defendant Schattering, and indicting that the grievance was addressed in previous CORC decisions (Grievance Nos. UST-34303-08, UST-35637-08, and WDE-30064-09).  (Compl. ¶ 98; Pls. Ex. 19).  Plaintiffs allege that the above constitutes evidence of a DOCS policy that "creates excessive government entanglement in religion, promotes one religion over other religions and non-religion, [and] gives one religion special privilege."  (Compl. ¶ 99).

Plaintiffs' fourth cause of action is similar to their third, in that it relates to DOCS' dietary practices.  On May 19, 2008, Cardew submitted a grievance (Grievance No. UST-35637-08) at Upstate, alleging that he was required to participate in the "Catholic religious dietary ritual of Fasting of Friday" because the statewide menu did not offer red meat.  (Compl. ¶ 102).  The IGRC denied Grievance No. UST-35637-08, explaining that Upstate simply follows the statewide menu set up by Nutritional Services, and that the issue was previously addressed in their decision for Grievance No. UST-34303-08.  (Compl. ¶ 103).  Cardew appealed the IGRC decision to Superintendent Woods, who denied the

appeal on June 16, 2008, stating that "[t]here is no indication on the menu that red meat is not served on Fridays because of the Catholic Religion." (Compl. ¶ 104; Pls.' Ex. 20). Cardew appealed the superintendent's decision to the CORC, who upheld the superintendent's determination of Grievance No. UST-34303-08, stating that "inmates are not being forced to participate in a religious ritual." (Compl. ¶ 105; Pls.' Ex. 21).

Cardew was transferred to Wende in December 2008, where he claimed that he was "required to participate in this same Catholic religious dietary ritual along with Arkim. (Compl. ¶ 106). Cardew submitted a grievance (Grievance No. WDE-30064-09) on January 5, 2009, based on the alleged requirement that he participate in the "Catholic religious dietary ritual of Fasting on Friday by not eating red meat." (Compl. ¶ 107). The IGRC denied Grievance No. WDE-30064-09 on January 15, 2009, explaining that the Wende Food Service Administrator has no control over the statewide menu. (Compl. ¶ 108). Deputy Superintendent Sticht denied Cardew's appeal on January 23, 2009, explaining that the Division of Nutritional Services determines what food will be served each day and "[t]here is no force of religion to serve fish on Friday." (Compl. ¶ 109; Pls.' Ex. 23). Cardew appealed the decision to the CORC, who upheld the decision of the superintendent and indicated the issue had already been addressed in Grievance Nos. UST-34303-08 and UST-35636-08. (Compl. ¶ 110; Pls.' Ex. 24).

On April 6, 2009, Arkim submitted a grievance (Grievance No. WDE-

30569-09) based on his objection to the Friday menu served by DOCS that did not offer red meat.  (Compl. ¶ 111).  Arkim was called to the Wende grievance office on April 9, 2009, and given a direct order by the sergeant to sign off on Grievance No. WDE-30569-09 "because [the IGRC] had already addressed this issue and they were not going to address it again."  (Compl. ¶ 112).  Arkim was allegedly not given the opportunity to appeal.  (Compl. ¶ 112).  Cardew and Arkim allege that these dietary practices constitute a custom and policy that requires them to participate in a "Catholic religious dietary ritual," and violates the Free Exercise Clause and the Establishment Clause of the First Amendment along with RLUIPA. (Compl. ¶¶ 11, 116).

Cardew's final cause of action based on the alleged nutritionally deficient diet served to him at Upstate that Cardew alleges caused him to lose 96 pounds, is not the subject of defendants' motion for judgment on the pleadings.  Therefore, the court will not consider this cause of action in this report and recommendation.

## II.   **Judgment on the Pleadings**

After the pleadings are closed, a motion to dismiss for failure to state a claim is properly brought as a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  *Maggette v. Dalsheim*, 709 F.2d 800, 801 (2d Cir. 1983) (citations omitted).  *See* Fed. R. Civ. P. 12(b), 12(c) and 12(h)(2).  The motion for judgment on the pleadings is then treated according to the same standard as a motion to dismiss under Rule 12(b)(6).  *Id.*

13

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 71 (2d Cir. 1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62

14

F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment).  Finally, in the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers.  *See Locicero v. O'Connell*, 419 F. Supp. 2d 521, 525 (S.D.N.Y. 2006) (citation omitted).

Here, as explained above, plaintiffs structured their facts according to the grievances they filed and referred to them by grievance number.  In their Memorandum of Law in Response to Defendants' Partial Motion to Dismiss (Dkt. No. 123), plaintiffs discuss the exhibits defendants attached to their Motion for Judgment on the Pleadings (Dkt. No. 107).  In their Memorandum of Law in Response to Defendants' Partial Motion to Dismiss (Dkt. No. 123), plaintiffs also reference the exhibits they attached to their Motion to Dismiss Affirmative Defenses (Dkt. No. 76).  (*See* Dkt. No. 123 at 8).  Plaintiffs also specifically requested that the court incorporate the exhibits attached to Dkt. No. 76 in their Memorandum of Law in Response to Defendants' Partial Motion to Dismiss (Dkt. No. 123 at 12, 15).[4]  Accordingly, this court will consider these materials in its

---

[4] Plaintiffs request that the court incorporate only exhibits numbered 1–25, because exhibits numbered 26–39, 44, and 46 relate to Cardew's cause of action based on his weight loss, which is not a part of Defendants' Motion for Judgment on the Pleadings.  Exhibits numbered 41, 43, and 45 are letters from Defendant Perlman relating to plaintiffs' causes of action related to the alleged dietary policy of DOCS.  Plaintiffs explicitly refer to the two letters included by this court above in the complaint.  (*See* Compl. ¶¶ 89, 97).

analysis of defendants' motion.

### III.   <u>**Equal Protection**</u>

Cardew argues that he was not given a DOHU at Upstate because of his race and lack of religious affiliation, in violation of the Equal Protection Clause.  Both Cardew and Arkim contend that, after requesting to cell together at Wende, they were denied a DOHU, in violation of the Equal Protection Clause.

Litigation over double celling is not new.  As a result of a large increase in the number of inmates in state custody in the late eighties and early nineties, DOCS implemented a double-celling policy in 1995 to address the problem, setting out procedures governing the assignment of two inmates to a cell originally designed for one person.  *See Jones v. Goord*, 435 F. Supp. 2d 221, 228 (S.D.N.Y. 2006).  In *Jones*, a class-action lawsuit was brought against DOCS for its double-celling policy in its maximum-security prisons.  435 F. Supp. 2d at 227.  As evidenced by the opinion in *Jones*, prisoners traditionally object to being double-celled, and in *Jones*, challenged the change in policy as violative of the Eighth Amendment prohibition against cruel and unusual punishment.  435 F. Supp. 2d at 227.  Other prisoners have made similar objections to being double-celled.  *See Robinson v. NYS Dept. of Correctional Services*, No. 08-CV-911, 2009 U.S. Dist. LEXIS 92294 (N.D.N.Y. September 8, 2009).

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike.  *Giano v. Senkowski*,

54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).  Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.'" *Engquist v. Or. Dep't of Agric.*, __ U.S. __, 128 S. Ct. 2146, 2152 (2008).  To establish an equal protection violation, the plaintiff must show that the defendants applied a different standard to similarly situated individuals.  *Skehan v. Village of Mamaroneck*, 465 F.3d 96, 111 (2d Cir. 2006).  Plaintiffs must first show that they were treated differently than others similarly situated because of intentional or purposeful discrimination.  *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).  Then, plaintiffs must show that the difference in treatment cannot survive the appropriate level of scrutiny.  *Id.*

Inmates do not have a right to a specific housing assignment.  *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983) ("transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence"), abrogated on other grounds by *Sandin v. Conner*, 515 U.S. 472 (1995).  However, plaintiffs argue that this court should apply strict scrutiny when evaluating the denial of a DOHU using race as a criterion.  "Strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." *Grutter v. Bollinger*, 539 U.S. 306, 327, 123 S. Ct. 2325, 156 L. Ed. 2d 304

(2003).  "The purpose of the test is to ensure that the government's choice to use racial classifications is justified, not to ensure that the contours of the specific racial classification that the government chooses to use are in every particular correct." *Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 210 (2d Cir. 2006).  In the prison context, the Supreme court has explained that the "'necessities of prison security and discipline,' are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities." *Johnson v. California*, 543 U.S. 499, 512 (2005) (quoting *Lee v. Washington*, 390 U.S. 333, 334 (1968)).

### A.      Cardew's Denial of a DOHU at Upstate

Cardew alleges that his race and physical size were the factors that prevented him from receiving a DOHU assignment at Upstate, which he alleges demonstrates that DOCS enforces a "policy" of segregation.  (*See* Compl. ¶¶ 47–53, 57–58).

Upstate is designated as a maximum-security facility that serves as "Special Housing Unit Facility to house selected inmates serving disciplinary dispositions specifying assignment to a Special Housing Unit or keeplock."  DOCS Directive #0023.  The method for assigning a DOHU to inmates at Upstate is governed by a set of criteria, which direct that the Deputy Superintendent of Security "shall conduct a risk assessment using the suitability and compatibility criteria set forth in subdivisions (b) and (c)."  (Upstate Inmate Double Cell Criteria, Dkt. No. 107-3

at 12).

Subdivision (b) is titled "Assessment of Suitability," and is comprised of six subsections: Information Assessment, Health, Mental Status, History and Behavior, DSS Review, and Medical Screening.  (Upstate Inmate Double Cell Criteria, Dkt. No. 107-3 at 12–14).  The subsection titled Information Assessment directs a general review of the information in the inmate population management system and other records.  *Id.*  The subsection titled Health instructs that inmates with a communicable disease should not be double-celled.  *Id.*  The subsection titled Mental Status indicates that inmates with certain psychiatric issues should not be double-celled.  *Id.*  The subsection titled History and Behavior contains four subparts: Victim Prone, Highly Assaultive Inmates, Homosexual Behavior, and Criminal Histories of Extreme Violence.  *Id.*  These subparts direct that inmates with a "pattern of being victimized by other inmates," inmates with a "lengthy and persistent pattern of indiscriminate and extremely vicious predatory assaults on other inmates," inmates "found guilty at disciplinary hearings of predatory homosexual acts while incarcerated," and/or inmates whose "criminal histories are marked by a lengthy and persistent pattern of extraordinarily violent crimes involving the indiscriminate, intentional and depraved infliction of extreme physical pain resulting in serious physical injury to the victims" should not be double-celled.  *Id.*

The subsection titled DSS Review describes the possibility that an inmate

19

may "positively change" behavior so that the "history of demonstrated behavior" considered in the History and Behavior subsection becomes "less of a concern." *Id.*  In such a case, the Deputy Superintendent of Security can give the reason why the inmate qualifies to be double-celled in the "Override Factor" section of the "SHU Double-Cell Information Sheet." *Id.*  The Medical Screening subsection directs a review of an inmate's medical records, as well as a physical assessment, to determine if a medical condition exists that precludes an inmate from being double-celled. *Id.*

Subdivision (c) is titled "Assessment of Compatibility" and is comprised of six subsections: Ethnic or Religious Background, Physical Capabilities, Known Enemies, Victim Prone, History of Escape, and SHU Double-Cell Information Sheet.  (Upstate Inmate Double Cell Criteria, Dkt. No. 107-3 at 12–14).  The subpart titled Ethnic and Religious Background states, "The facility should attempt to take into account the ethnic and religious background of both candidates for the same double-cell.  It is not necessary, however, that they share the same ethnic or religious background." *Id.*  The subpart titled Physical Capabilities directs that the physical needs of inmates should be considered, giving the example that two inmates who both require a bottom bunk should not be double-celled. *Id.*  The subpart titled Victim Prone directs that inmates who have a pattern of being victimized should be housed together or with someone who the Duty Superintendent of Security determines does not pose a threat. *Id.*

20

The subpart titled History of escape indicates that inmates with a history of escape or attempts to escape should not be housed together.  *Id.*  The subpart titled SHU Double-Cell Information Sheet describes the form used to track the screening process and indicates that the factors listed in the criteria are not exhaustive.  *Id.*

Cardew argues that Upstate Administrators "consider two inmates of different ethnic backgrounds, etc., in the same DOHU a 'threat to safety and security.'"  (Pls.' Mem. of L. in Resp. to Defs.' Part. Mot. to Dismiss, n. 4 at 7).  Cardew's evidence supporting his allegation is the fact that he was single-celled and an alleged statement by Sergeant Thompson[5] that [Cardew] did not fit their "segregation policy."  (Dkt. No. 123 at 7).  Cardew's only other evidence of discrimination is an allegation that Corrections Counselor Boyea[6] told him that it was Deputy Superintendent for Security Bezio's policy to segregate inmates by race and size.  (Grievance No. UST-34086-08, Dkt. No. 107-3 p. 6).  These alleged statements are at odds with the response to Cardew's Case History and Record for Grievance No. UST-34086-08, which states that "grievant cannot be placed in a cell with another inmate because [grievant] weighs 341 pounds."  (Dkt. No. 107-3 at 4).

Plaintiffs place great emphasis on the difference between DOCS Directive 4003, which incorporates 7 N.Y. Codes R. & Reg §§ 1701.1–.8, entitled "Double

_____

[5] Sergeant Thompson is not a named defendant in this case.

[6] Counselor Boyea is not a named defendant in this case.

21

Cell Housing in Converted Single Cells," and 9 N.Y. Codes R. & Reg. § 7621.7,

entitled "Double Occupancy Housing Units Originally Designated and

Constructed for Double Occupancy." (*See* Pls.' Mem. of Law in Opp'n to Defs.'

Par. Mot. to Dismiss, Dkt. No. 123 at 6).  Plaintiffs allege that the defendants

incorrectly rely on DOCS Directive 4003, when they should be looking to 9 N.Y.

Codes R. & Reg. § 7921.7, because DOCS Directive 4003 is directed at "a

maximum or medium security cell . . . originally designed to accommodate a

single inmate that has been equipped to accommodate two inmates," which does

not apply to Upstate, whose cells were originally constructed to accommodate two

inmates.  (*See* Pls.' Mem. of Law in Opp'n to Defs.' Par. Mot. to Dismiss, Dkt.

No. 123 at 6; DOCS Directive #0023).

   Plaintiffs' distinction is inappropriate, however, because the Upstate Inmate

Double Cell Criteria implement 9 N.Y. Codes R. & Reg. § 7621.7, which states

that the compatibility standards shall include, but not be limited to, "the following

factors: (1) the ethnic and religious backgrounds of the inmates; (2) the physical

capabilities of the inmates; (3) whether the inmates smoke; and (4) known enemies

of record."  9 N.Y. Codes R. & Reg. § 7621.7(h).  As described above, the Upstate

Double Cell Criteria incorporates the standards in 9 N.Y. Codes R. & Reg. §

7621.7, and adds additional standards.[7]  Therefore, the appropriate criteria to

---

[7] The only exception is the standard relating to smoking, which is irrelevant, as smoking indoors in New York State Prisons has been banned since 2001.  *See Denis v. N.Y.S. Dep't of Corr. Servs.*, No. 05 Civ. 4495, 2006 U.S. Dist. LEXIS 3118, at *2–*3 (S.D.N.Y. January 30,

review for the purposes of Cardew's denial of a DOHU at Upstate are the Upstate Inmate Double Cell Criteria.  Cardew then that alleges the criteria "might be written in a neutral manner but [are] not used that way[8]."  Pls.' Mem. of L. in Opp. to Defs.' Mot. to Dismiss at 7, Dkt. No. 123).  *See Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886)).[9]

As noted above, Upstate houses "inmates serving disciplinary dispositions specifying assignment to a Special Housing Unit or keeplock."  DOCS Directive #0023.  In other words, Upstate houses inmates who exhibit disciplinary problems.  Plaintiff Cardew's disciplinary history is included on the Upstate SHU Double-Cell Information Sheet: "Harassment, False Info[.], Impersonation, Facil[.] Corr., C.D., D.O., Bribe[r]y/Extort. . . . Threats . . . ."[10]  (Dkt. No. 107-3 p. 11).  From this history, it is clear that Cardew has an extensive disciplinary history.  While plaintiff Cardew is correct that there is no explicit weight requirement provision in the Upstate Inmate Double Cell Criteria, Cardew's SHU Double-Cell Information

---

2006).

[8] Cardew refers in his memorandum to the Upstate Double Cell Criteria by exhibit number, Defendants' Exhibit B, Dkt. No. 107-3 at 14.

[9] Another method of stating a claim under the Equal Protection Clause is to allege that a "facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus."  *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 1999) (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264–65 (1977)).

[10] The missing portions in the quotation are indecipherable on the copy of the form.

Sheet indicates that his weight was reviewed as part of the screening process, as indicated by the three places on the form where his weight is referenced.[11]  (*See* Dkt. No. 107-3 p. 11).  Cardew's "physical capability" in January 2008 was related to his height and weight.  The example given in the Upstate Inmate Double Cell Criteria of physical capability is when an inmate must be on the bottom bunk, for whatever reason.  (*See* Dkt. No. 107-3, p. 14).  Although the SHU Double-Cell Information Sheet does not indicate that plaintiff Cardew required a bottom bunk, Cardew states in the complaint that on the day he arrived at Upstate, he was "provided with a medical permit for a bottom bunk."  (Compl. ¶ 45).

Plaintiff Cardew alleges in the Response to Defendants' Motion to Dismiss that Sergeant Thompson notified Cardew that he was being placed in a DOHU by himself because Cardew did not fit their "segregation policy."  (Dkt. No. 123 at 7).  The Upstate Inmate Double Cell Criteria clearly states, "It is not necessary . . . that [inmates in a DOHU] share the same ethnic or religious background."  (Dkt. No. 107-3 p. 14).  Cardew's grievance alleging racial segregation was ultimately reviewed by the CORC, which found that it had "not been presented with sufficient evidence to substantiate any malfeasance by staff."  (Dkt. No. 107-3 p. 1).  The only evidence that Cardew presents in his grievance and in this §1983 action that he was the victim of a "segregation policy" at Upstate is his conclusory

---

[11] It is unclear why the references to weight at the top and bottom of the form indicate "300," when the middle of the form indicates: "Wt 341 Ht 6'4"."  (*See* Dkt. No. 107-3 p. 11).  However, plaintiff Cardew does not dispute that he weighed over 300 pounds in January 2008.

claim about what he was told by staff and his subjective belief that his denial of a DOHU was motivated by race.  The DOCS staff documented that, by virtue of his weight and/or his disciplinary history, Cardew was found not to be suitable for double celling with anyone at Upstate, regardless of their race or ethnicity. Cardew was assigned a cell by himself, not with another inmate of his same race. Cardew does not allege that any other specific inmates at Upstate were segregated by race.  Plaintiff Cardew's grievance alleges that he was *told* that it was the *policy* that inmates were segregated by race and size, but his own treatment is inconsistent with that unsupported allegation.  (Grievance No. UST-34086-08, Dkt. No. 107-3 pp. 5–6).

In the end, Cardew does not state a plausible claim that he was treated any differently than any other inmate of his ethnicity, or that inmates of his ethnicity at Upstate were treated any differently as a group.  While plaintiffs' complaint may conceivably suggest a possible challenge to the DOCS double-celling policies on their face, he has not stated a viable claim that the policy was applied to him in a racially discriminatory manner.

**B.     Plaintiffs' Denial of a DOHU at Wende**

When Cardew first arrived at Wende, he was housed with another inmate of a different race.  (Compl. ¶ 55).  The next day, on December 31, 2008, Cardew was removed from his DOHU and placed in a Single-Occupancy Housing Unit (SOHU), after staff allegedly told him he could not share a cell with an inmate of

another ethnic and religious background.[12]  (Compl. ¶ 56).  Both plaintiffs allege

that because Cardew chooses not to affiliate with a religion, and Arkim identifies

his religion as "Protestant," they were not allowed to cell together at Wende.

(Compl. ¶¶ 57–58).  Additionally, they argue that because they do not share the

same ethnic background, they were not permitted to share a cell.  *Id.*  Plaintiffs

contend that, because their request for a DOHU was denied, and they are of

different ethnic and religious backgrounds, DOCS was pursuing a discriminatory

policy of segregating them based on race and/or religion.  (*See* Compl. ¶¶ 47–53,

57–58).

DOCS Directive 4003, entitled "Double Cell Housing in Converted Single

Cells," is directed at "a maximum or medium security cell . . . originally designed

to accommodate a single inmate that has been equipped to accommodate two

inmates."  (*See* Pls.' Mem. of Law in Opp'n to Defs.' Par. Mot. to Dismiss, Dkt.

No. 123 at 6).  DOCS Directive 4003 § 1701.5(c)(2)(i) states that "Any inmate

over 6'5" or currently weighing over 299 pounds shall be precluded from a double-

cell assignment," and § 1701.5(d)(2) states, in pertinent part, that "the facility

should attempt to take into account the ethnic and religious background of both

candidates for the same double-cell.  It is not necessary, however, that they share

the same ethnic or religious background."  (Dkt. No. 107-2, pp. 1–7).

---

[12] Plaintiffs do not name the staff at Wende who allegedly gave the reason for the denial
fo a DOHU.

The CORC explained that "this decision [to deny the plaintiffs' DOHU request] was based upon [Cardew's] *extensive disciplinary history and several placements in protective custody*."  (Pls.' Ex. 13, Dkt. No. 76-2) (emphasis added). Cardew was not permitted to share a cell with anyone at Wende, including Arkim, which is inconsistent with plaintiffs' argument that the DOCS decision to deny their request to cell together was motivated by race or religion, as opposed to the expressed security concerns.  Again, plaintiffs do not allege that Arkim, Cardew, or other inmates at Wende were only housed with inmates sharing the same ethnic and religious background.  Relying only on conclusory allegations that DOCS staff admitted discriminatory intent, plaintiffs fail to state a plausible claim that the DOCS housing policies were applied against them in a discriminatory manner.

## C.    Facial Challenge to DOCS Policies

Plaintiffs also argue that the DOCS double-celling policies, on their face, cannot survive the strict scrutiny analysis described in *Johnson v. California*.  The DOCS policies clearly list ethnicity as one of many factors used to determine whether inmates may, consistently with valid penological concerns, such as inmate safety and institutional security, be assigned as cell mates.  While the DOCS policies might well survive a facial challenge, even under a strict scrutiny analysis,[13] the defendants do not address *Johnson* or strict scrutiny in their

---

[13] This court notes that *Johnson* refers to policies from states other than California that may be similar to the policies at issue here, and that the *Johnson* majority implied that they may be constitutional.  *See* 543 U.S. at 509 n.2.  To the extent the application of strict scrutiny to

memorandum of law.[14]  Plaintiffs also allege, based on alleged statements by various DOCS employees, that there is an unwritten policy to apply the DOHU screening process in such a way that segregates inmates by race.[15]  Although plaintiffs' unsupported allegations are suspect, in the context of a motion for judgment on the pleadings without adequate briefing by the defendants, this court cannot recommend granting defendants' motion with respect to plaintiff's facial challenge.

Only individuals who are involved in the enforcement and administration of the challenged regulations and policies should remain as defendants in connection with plaintiffs' facial challenge to the DOCS policies under the Equal Protection clause.  *See, e.g., Pugh v. Goord*, 571 F.Supp.2d 477, 517 (S.D.N.Y. 2008) (in a

---

prison housing schemes that use race as a factor was uncertain at the time of the conduct involved in this action, the defendants may also have valid arguments based on qualified immunity.  *See, e.g., Mayweathers v. Hickman*, 05cv713, 2008 WL 42006822, at *4–7 (S.D. Cal. May 16, 2008), Report-Recommendation adopted, 2008 WL 4690521 (S.D. Cal. Oct. 21, 2008), *aff'd*, 08-56835, 2010 WL 3258591 (9th Cir. Aug. 18, 2010).

[14] Nor do the defendants' papers examine whether these plaintiffs would have standing to mount a facial challenge to the DOCS policies that were not applied in a discriminatory manner towards them.  *See, e.g., Shabazz v. Cuomo*, 93 CIV. 7692, 1998 WL 102050, at *1–3 (S.D.N.Y. Mar. 05, 1998) (a plaintiff who has not suffered a concrete harm from the application of a challenged regulation ordinarily does not have standing to assert a facial challenge to the same regulation) (citing, *inter alia, Davidson v. Mann*, 129 F.3d 700, 701–702 (2d Cir.1997); *Mayweathers v. Hickman*, 2008 WL 42006822, at *8.

[15] Any proof indicating a racially discriminatory purpose would shift the burden to defendants to establish that the same decision to deny plaintiff Cardew a DOHU at Upstate and plaintiff Cardew and Arkim's request for a DOHU together would have resulted even in the absence of the alleged impermissible purpose.  *See Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. at 270 n.21; *see also Hayden v. Paterson*, 594 F.3d 150, 162–63 (2d Cir. 2010).

suit to enjoin the enforcement of an act alleged to be unconstitutional, the

defendant(s) must have some connection with the enforcement of the act) (citing,

*inter alia*, *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372–73 (2d

Cir.2005)); *Curtis v. Pataki*, No. 96 Civ. 425 (RSP), 1997 WL 614285, at *5–6

(N.D.N.Y. Oct.1, 1997) ("[w]hen a plaintiff seeks a declaration that a particular

statute is unconstitutional, the proper defendants are the government officials

charged with the administration and enforcement of the statute.").

   Plaintiff Cardew alleges that he was told that it was defendant Bezio's

"segregation policy" at Upstate, and the Upstate and Wende regulations direct that

the screening process is to be conducted by the Deputy Superintendent for

Security—defendants Sheahan and Quinn for Upstate and defendant Sticht for

Wende.  (*See* Compl. ¶¶ 47, 52, 53, 60, 65). Plaintiffs also allege that the Office of

Classification and Movement oversees DOHU assignments (defendant Jordan is

the director) and that defendant LeClaire, Jr., drafted and implemented the

challenged criteria for both facilities.  (*See* Compl. ¶¶ 44, 47, 50).  Plaintiffs allege

that defendants Kearney and Casaceli determine the DOHU segregation at Wende.

(*See* Compl. ¶ 65).  Therefore, as to plaintiffs' equal protection claims, this court

recommends dismissing the complaint as to all defendants *except* defendants

Bezio, Cascaceli, Jordan, Kearney, LeClaire, Jr., Quinn, Sheahan, and Sticht.[16]  All

_____

[16] These defendants retain the right to challenge, in a future summary judgment motion, whether they would be appropriate parties to a facial challenge to the DOHU policies and regulations.

29

other named defendants under plaintiffs' causes of action related to equal protection should be dismissed, as they have no control over the implementation or creation of the challenged criteria.

## IV.   First Amendment and RLUIPA

Plaintiffs argue that defendants violated their first amendment rights in two ways: first, that because religion is a criterion used when making DOHU assignments, defendants are "endorsing religion over non-religion" and "trying to coerce Cardew into acting contrary to his beliefs to declare a religion in order to be housed in a DOHU." (Compl. ¶ 84). Second, plaintiffs contend that the "non-red-meat" menu served on Ash Wednesday and Fridays forces them to participate in a "Catholic religious dietary ritual." (Comp. ¶¶ 86, 94, 101).

As a preliminary matter, using religion as a criterion in DOHU assignments does not implicate the First Amendment under the facts presented by plaintiffs. Even if, as plaintiffs allege, DOCS required inmates to share the same religion in order to inhabit a cell together (which the DOCS policies do not require), that would be qualitatively different than compelling prisoners to declare a *specific* religion or preventing them from double celling because they are members of a *particular* religious faith or of no religious faith. Nothing alleged in plaintiffs' complaint plausibly indicates that the DOCS criteria for double celling required inmates to declare membership in a religion as a prerequisite to receive a DOHU, or otherwise infringed in any way on either of their religious beliefs.

The remaining issue for the court to analyze relates to the meatless menu on particular days.  The court will assess plaintiffs' arguments under the Establishment Clause, the Free Exercise Clause, and RLUIPA, in that order.

**A.     Establishment Clause**

The First Amendment's proscription that "Congress shall make no law respecting an establishment of religion," most clearly refers to the prohibition against establishing a state church, but the Supreme Court has never limited the mandate of the Establishment Clause to this purpose alone.  *U.S. Const. amend. I; Skoros v. City of New York*, 437 F.3d 1, 38 (2d. Cir. 2006) (citing *Lemon v. Kurtzman*, 403 U.S. 602, 612).  "'The clearest command of the *Establishment Clause* is that one religious denomination cannot be officially preferred over another.'" *Skoros v. City of New York*, 437 F.3d at 39 (citing *Larson v. Valente*, 456 U.S. 228, 244 (1982)).

The method by which courts analyze Establishment Clause issues is the three-pronged test given by the Supreme Court in *Lemon v. Kurtzman*: government action that interacts with religion (1) "must have a secular . . . purpose," (2) must have a "principal or primary effect . . . that neither advances not inhibits religion," and (3) "must not foster an excessive government entanglement with religion."  403 U.S. at 612–13.  Although the so-called "*Lemon*

test" has been criticized numerous times, it remains the test governing Establishment Clause analysis in the Second Circuit. *See Skoros v. City of New York*, 437 F.3d at n.3 at 42 (collecting cases and discussing criticism of *Lemon*, but still applying the *Lemon* test to plaintiff's Establishment Clause challenge).

When applying the first prong of the *Lemon* test, a court should usually accord "deference" to a clear government statement of an actual secular purpose, as long as it is "genuine, not a sham, and not merely secondary to a religious objective." *Skoros v. City of New York*, 437 F.3d at 49–50 (citing *McCreary County v. ACLU*, 545 U.S. 844, 864 (2005)). Part of the first prong is to inquire as to how the government's purpose would be perceived by "an 'objective observer,' one who takes account of the traditional external signs that show up in the text, legislative history, and implementation of the statute.'" *Skoros v. City of New York*, 437 F.3d at 58 (quoting *McCreary County v. ACLU*, 545 U.S at 862).

The second prong asks whether a "reasonable observer," a "personification of a community ideal of ideal behavior" would understand the government action to "endorse religion," or "one religion over another." *Skoros v. City of New York*, 437 F.3d at 81–82 (citing *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 75 (2001)). The last prong seeks to answer whether the government action "'fosters excessive state entanglement with religion.'" *Skoros v. City of New York*, 437

32

F.3d at 96 (citing *Commack Self-Serv. Kosher Meats, Inc. v. Weiss*, 294 F.3d 415,

425 (2002)).  Analysis under the third prong is similar to the analysis under the

second prong, and is "properly treated as 'an aspect'" of the inquiry under the

second prong.  *Skoros v. City of New York*, 437 F.3d at 97 (citing *Agostini v.*

*Felton*, 521 U.S. 203, 232–33 (1997)).  This analysis examines "the character and

purposes of the institutions that are benefitted, the nature of the aid that the State

provides, and the resulting relationship between the government and religious

authority."  *Lemon v. Kurtzman*, 403 U.S. at 615.

The Third Circuit Court of Appeals, in a similar case, applied the *Lemon*

test to reject an Establishment Clause challenge to the serving of vegetarian meals

to a jail population during the lenten season:

> . . . [The jail's] actions had the secular purpose of feeding the inmates.  The
> service of these meals did not have the primary effect of advancing
> Catholicism or inhibiting other religions, nor did it foster the excessive
> entanglement of government with religion.  The eating of a vegetarian
> repast is not inherently linked to a religious practice.  Vegetarian meals are
> regularly eaten by many different people on an everyday basis, regardless of
> their religion.

*Travillion v. Leon*, 248 Fed. Appx. 353, 355–56 (3d Cir. 2007).  This court agrees

with the analysis of *Travillion*.  However, the DOCS menu policies would also

pass muster under the Establishment Clause even if, as plaintiffs argue, the policy

was intended to accommodate the dietary needs or preferences of Catholic

inmates.

Prisons deal with "a unique area of tension between the establishment clause and the free exercise clause of the First Amendment." *United States v. Kahane*, 396 F. Supp. 687, 698 (2d. Cir. 1975) *ordered modified by* 527 F.2d 492 (2d. Cir. 1975). The *Lemon* test is "tempered" by the test found in *Turner v. Safley*, 482 U.S. 78 (1987). *See Pugh*, 571 F. Supp. at 494. The *Turner* court held that when considering regulations in the prison context, the regulations must be "reasonably related to legitimate penological interests." 482 U.S. at 89. In prisons, "where the government has significant control over inmates' lives, 'a niche has necessarily been carved into the establishment clause to require the government to afford opportunities for worship." *Muhammad v. City of New York Dep't of Corr.*, 904 F. Supp. 161, 198 (2d. Cir. 1995) (quoting *United States v. Kahane*, 296 F. Supp. at 698).

The present case deals directly with that "niche." If DOCS is accommodating other inmates' religious dietary practices, plaintiffs argue that defendants are violating the Establishment Clause. However, because of the nature of a penal institution, which controls practically every aspect of inmates' lives, accommodating the free exercise of the religion of choice by inmates necessarily involves some involvement by the government with religion.

34

Serving non-red-meat meals on Ash Wednesday and Fridays serves the valid penological purpose of feeding the inmates, while simultaneously meeting the religious dietary needs and preferences of a substantial segment of the prison population.  In a letter dated March 12, 2009, the DOCS Deputy Commissioner of Program Services, Kenneth S. Perlman wrote to Cardew at the request of Commissioner Fischer.  (Pls.' Ex. 43).  Deputy Commissioner Perlman stated that the "Office of Nutritional Services attempts to accommodate the majority of the population observances on major holidays and religious days such as Christmas and the Fourth of July. . . .  The Office of Nutritional Services provides a variety of menu items on Fridays that have no religious tenets."  *Id.*  By incorporating menu choices that are acceptable to most inmates, Catholic or not, DOCS' accommodation is rationally related to a valid penological purpose.

The superintendent's response to Grievance No. UST-34303-08, states that "the holidays that are listed on the menu are the same major holidays that are listed on a regular calendar.  For example[,] Ash Wednesday, Thanksgiving, July 4, Labor Day, etc."  (Pls.' Ex. B, Dkt. No. 123).  While Cardew correctly points out in his appeal statement on the same form that Ash Wednesday is not a legal holiday, the fact that DOCS designates religious holidays on their menu calendar is a *service* to inmates whose dietary restrictions may change on certain days.

35

DOCS provides kosher meals for Jewish inmates and accommodates the dietary requirements of Muslim inmates during the holy month of Ramadan.  *See Bass v. Coughlin*, 976 F.2d 98, 99 (2d Cir. 1992) (reaffirming *Kahane v. Carlson*, 527 F.2d 492 (2d Cir. 1975) that established that an Orthodox Jewish inmate had a right to kosher meals); *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d. Cir. 1990) (indicating that alternative portions are offered whenever pork is served and that special meals are provided to Muslim and Buddhist inmates on certain holidays). The fact that some religions are required to eat certain foods or to abstain from eating certain foods on specific days does not render those foods "religious" if they are otherwise acceptable under another person's belief system.  Under the dubious logic of plaintiff's First Amendment challenge to DOC menu practices, non-Jews and non-Muslims would be unconstitutionally forced to participate in a "religious dietary ritual"–abstaining from eating pork–every time DOCS did not serve pork as part of a meal.   Plaintiffs' First Amendment Establishment Clause challenge to the service of non-red-meat meals by DOCS should be dismissed.

**B.     Free Exercise Clause**

The First Amendment guarantees the right to the free exercise of religion. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005).  "Prisoners have long been understood to retain some measure of the constitutional protection afforded by the

First Amendment's Free Exercise Clause." *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).  This right "is not absolute or unbridled, and is subject to valid penological concerns, including those relating to institutional security." *Johnson v. Guiffere,* 04-CV-57, 2007 WL 3046703, at *4, 2007 U.S. Dist. LEXIS 77239 (N.D.N.Y. Oct.17, 2007).  The Free Exercise Clause extends "beyond mere attendance at congregate religious services into other aspects of prison life including, pertinently, that of an inmate's diet. . . ." *Id*.  The Second Circuit has held that it is "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples. . . ." *Ford,* 352 F.3d at 597 (citations omitted).  Therefore, to "deny prison inmates the provision of food that satisfies the dictates of their faith . . . unconstitutionally burden[s] their free exercise rights." *McEachin v. McGuinnis,* 357 F.3d 197, 203 (2d Cir. 2004).

Cardew appears to assert that because Catholics cannot eat red meat on, *e.g.*, Friday, that serving a "non-red-meat meal" on Friday becomes a *religious ritual* in which he is forced to participate, in violation of his "non-religion religiousness." Arkim, asserts that he is a Protestant, part of a group of denominations that originally "broke away from the Roman Catholic Church in the 16th Century Reformation where they protested Catholicism and its religious practices."  By serving fish on Friday, defendants allegedly "require Arkim to practice the

religious dietary rituals of Catholicism, they are forcing this religion upon him."
(Pls.' Mem. of L. in Opp. to Defs.' Part. Mot. to Dismiss, Dkt. No. 123 at 15).

Plaintiffs do not assert that they are generally forbidden, on any religious
grounds, from eating fish or any of the non-red-meat entrees.  They claim they are
somehow "forbidden" from eating non-red-meat meals on days when Catholics
must do so, and argue that plaintiffs should be allowed to eat red meat on such
days so that they are not "compelled" to participate in the Catholic religious
dietary tradition.  In other words, plaintiffs apparently concede that they can eat a
non-red-meat meal *e.g.*, on a Wednesday, so long as the adherents of any other
religion are not mandated to do so on that day *e.g.*, so long as it is not Ash
Wednesday.

Plaintiffs are not alleging that, by serving a meal that does not include red
meat on Fridays and Ash Wednesday, DOCS is offering only something that
plaintiffs cannot eat pursuant to their religious beliefs, in the way that serving pork
to Muslim or Jewish inmates would be contrary to the tenets of their respective
religions.  Plaintiffs try to stand the logic of *McEachin v. McGuinnis* on its head
by arguing that, when DOCS serves them types of food *not* forbidden by their
religion (or non-religion), but *required* by adherents of other religions, it *compels*
plaintiffs to observe the tenets of the other religions.  Their allegations do not

38

support a plausible free exercise claim.

###    C.    RLUIPA

RLUIPA applies when a government imposes "a substantial burden on the

religious exercise of a person residing in or confined to an institution."  42 U.S.C.

§ 2000cc-4.  Because this court has found that defendants are not interfering with

plaintiffs' exercise of their religion (or non-religion), RLUIPA does not apply.

RLUIPA also states:

> "[n]othing in this Act shall be construed to affect, interpret, or in any way
> address that portion of the first amendment to the Constitution prohibiting
> laws respecting an establishment of religion (referred to in this section as
> the "Establishment Clause").  Granting government funding, benefits, or
> exemptions, to the extent permissible under the Establishment Clause, shall
> not constitute a violation of this chapter."

42 U.S.C. § 2000cc-4.  Because this court has rejected the plaintiff's

Establishment Clause challenge to the DOC menu policy, despite the arguable

benefit conferred on Catholic inmates, a similar claim based on RLUIPA must also

fail.  Accordingly, this court will not further analyze plaintiffs' claims under the

standards adopted in RLUIPA.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for judgment on the pleadings

(Dkt. No. 107) be **GRANTED IN PART AND DENIED IN PART**, as detailed

above, and it is further

**RECOMMENDED**, that the complaint based on violation of the Equal

Protection Clause should be dismissed as to defendants Bedard, Bellnier, Bessette,

Bradford, Cameron, Cohen, Diaz, Effman, Ferrara, Hogan, Kirkpatrick,

McGuinness, Ogorman, Reinhold, Rondeau, and Woods; and it is further

**RECOMMENDED**, that defendants' motion for judgment on the pleadings

(Dkt. No. 107) be **GRANTED**, as to all defendants named in plaintiffs' First

Amendment claims based on the Free Exercise Clause and the Establishment

Clause and their claim based on the Religious Land Use and Institutionalized

Persons Act (RLUIPA).[17]

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have

fourteen (14) days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court.  **FAILURE TO**

**OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d

Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15

---

[17] If this court's recommendations are adopted, the claims remaining in the complaint
would be the facial Equal Protection challenge to the DOHU policies and regulations in
plaintiffs' first cause of action against defendants Bezio, Cascaceli, Jordan, Kearney, Leclaire,
Quinn, Sheahan, and Sticht, as well as plaintiffs' Sixth Cause of Action against all defendants
named therein, which the instant motion did not challenge.

40

(2d Cir. 1989)); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72.


Dated: December 9, 2010

Hon. Andrew T. Baxter
U.S. Magistrate Judge