UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

BARRY ARKIM,

                                    Plaintiff,

          vs.                                          9:09-CV-0775 (GLS/ATB)

JOSEPH F. BELLNIER, *et al.*,

                                    Defendants.
_____

BARRY ARKIM, Plaintiff, *pro se*
COLLEEN D. GALLIGAN, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

Presently before the court is defendants' motion for summary judgment. This matter was referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, Chief United States District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rules N.D.N.Y. 72.3(c).

## DISCUSSION

**I.**    <u>**Procedural Background**</u>[1]

In this civil rights complaint, plaintiff[2] alleged that defendants violated his

---

[1] The court has described the factual and procedural background in detail in its December 9, 2010 Report and Recommendation and its January 8, 2013 Decision and Order. (Dkt. Nos. 133 and 153). The court will, therefore, assume the parties' familiarity with the background and will only briefly summarize it here as necessary to address the pending motion.

[2] The complaint was originally filed by plaintiff and former co-plaintiff, Robert Cardew. On December 5, 2012, Cardew filed a letter stating that he wished to withdraw as a plaintiff and have all the claims pertaining to him dismissed. (Dkt. No. 147). On January 7, 2013, a stipulation of dismissal was filed, signed by Cardew and defense counsel. (Dkt. No. 151). On January 8, 2013, I signed the stipulation, terminating Cardew as a party to this action, leaving only plaintiff Arkim.

rights under the Equal Protection Clause, the First Amendment, and the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc-2000cc-5 ("RLUIPA").[3] (*See generally* Dkt. No. 1 ("Compl.")). Plaintiff sought significant monetary damages, as well as injunctive relief. After answering the complaint (*see* Dkt. Nos. 67, 84, 93), defendants filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure ("Rules") 12(c). (Dkt. No. 107).

On December 9, 2010, I recommended granting defendants' motion in part. (Dkt. No. 133). The recommendation was adopted in its entirety by Chief Judge Sharpe in a Decision and Order dated August 2, 2011. (Dkt. No. 139). Chief Judge Sharpe dismissed plaintiff's First Amendment and RLUIPA claims and several defendants. Chief Judge Sharpe also dismissed plaintiff's claim that the Department of Corrections ("DOCS")[4] policy regarding double occupancy housing was unconstitutional under the Equal Protection Clause as applied to plaintiff. Plaintiff's claim that the policy was unconstitutional on its face, however, survived defendants' motion for judgment on the pleadings, primarily because defendants failed to address this claim in their motion. (*See* Dkt. No. 133 at 27-28).

On April 30, 2013, the remaining defendants filed a motion for summary

---

[3] The complaint also contained a claim by former plaintiff Cardew that defendants violated his Eighth Amendment rights by serving him a nutritionally deficient diet. As noted above, that claim, and the defendants associated with it, were dismissed when Cardew withdrew his claims.

[4] The Department of Correctional Services ("DOCS") is now known as the Department of Corrections and Community Supervision ("DOCCS").

judgment pursuant to Rule 56. (Dkt. No. 158). Although plaintiff was granted an extension to respond to the motion (Dkt. No. 163), he did not file an opposition. The only remaining claim is that defendants' double occupancy housing assignment policies violate the Equal Protection Clause on their face. For the following reasons, this court finds that the policies do not violate the Equal Protection Clause and will recommend dismissal of the entire complaint against all remaining defendants.

## II. Summary Judgment Standard

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show

that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

### III. <u>Equal Protection</u>

#### A. Facts

In the 1980s and early 1990s, the number of inmates incarcerated in New York State correctional facilities increased dramatically. (Declaration of Lucien Leclaire, Jr. ("Leclaire Decl.") ¶ 6). As a result, out of necessity, DOCS began discussing how to implement double-celling of inmates. (*Id.*). Guidelines were issued in 1995, DOCS regulations were adopted in 1997, and the following year, Departmental Directive No. 4003 was issued. (*Id.* at ¶¶ 9-12). Directive 4003 sets forth the process to be followed and the factors that must be considered, when evaluating an inmate's eligibility for assignment to double cell housing and compatibility with other inmates with whom he may be housed. (*Id.* at ¶ 13, Ex. A). Responsibility for the selection rests with the Deputy Superintendent of Security ("DSS") or his designee. (*Id.*, Ex. A at 2). The responsible party is directed to consider an inmate's eligibility, suitability, and compatibility when making the double celling decision, as described in detail in the policy. (*Id.*).

After determining that an inmate is eligible for assignment to double cell housing, DOCS must determine an inmate's suitability for double cell housing. (*Id.*

4

Ex. A at 2-4). The suitability section of DOCS Directive 4003 consists of six subsections: Information Assessment, Physical Status, Mental Status, History and Behavior, DSS Review, and Medical Screening. (*Id.*). After considering suitability criteria, DOCS will then consider a non-exclusive list of compatibility factors. (*Id.*, Ex. A at 4). These include: Volunteers; Ethnic or Religious Background; Language; Size or Other Physical Characteristics; Age; Criminal History/Length of Sentence; Program/Job Assignment; Family Relationship; and Known Enemies. (*Id.*). With respect to the subpart on ethnic and religious backgrounds, the policy states that "[t]he facility should attempt to take into account the ethnic and religious background of both candidates for the same double-cell. It is not necessary, however, that they share the same ethnic or religious background." (*Id.*). The purpose of considering the ethnic and religious background of an inmate along with the other compatibility factors "is to provide for the safety of the inmates, and the security of the facility." (*Id.* at ¶ 19). The decision of whether an inmate may be housed in a double-cell is within the discretion of the DSS or designee. (*Id.*). The policy also clarifies that no inmate has a right to be housed in a double cell or to be housed in a double cell with a particular inmate. (*Id.*, Ex. A at 4).

In February 2009, plaintiff submitted a "volunteer to double cell" request, requesting to be placed in a double cell with Cardew. (Compl. ¶ 57). According to plaintiff, the request was denied because several defendants "have a custom and policy . . . to deny inmates of different ethnic and religious backgrounds to voluntarily be housed in [double occupancy housing units]." (Compl. ¶ 58). Plaintiff submitted a

5

grievance on March 9, 2009, alleging discrimination on the basis of ethnicity and religion based on this denial.[5]  (Compl. ¶ 62).  Superintendent Kirkpatrick's decision states that the grievance was denied, and that plaintiff was not permitted to be housed with Cardew for safety and security reasons.  (*See* Compl. ¶ 68; Defendants' Statement Pursuant to Rule 7.1(a)(3) ("Rule 7.1 Statement") ¶ 3).  Plaintiff appealed this decision to the Central Office Review Committee ("CORC") which upheld the superintendent's decision, finding that plaintiff was denied a double occupancy housing unit with Cardew due to safety and security and that they were not presented with sufficient evidence of racial or religious discrimination.  (Compl. ¶ 73).

### B. Legal Standards

A plaintiff may make two types of constitutional challenges to a regulation–an "as-applied" challenge, and a facial challenge.  "In an as-applied challenge, the question is whether the statute would be unconstitutional if applied literally to the facts of the case." *United States v. Polouizzi*, 697 F. Supp. 2d 381, 387 (E.D.N.Y. 2010).  A facial challenge, on the other hand, is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which [the regulation] would be valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987)).[6]

---

[5] Cardew also submitted a volunteer to double cell request which was denied, and he subsequently filed a grievance.  (Compl. ¶¶ 57, 59-61).

[6] The court notes that the standard set forth in *Salerno* has been the subject of debate. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (acknowledging that "some Members of the Court have criticized the *Salerno* formulation").  However, the *Salerno* standard remains the appropriate standard for evaluating most facial challenges. *See, e.g., Ruston v. Town Bd. for Skaneateles*, 610 F.3d 55, 58 n.2 (2d Cir. 2010);

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly-situated people alike. *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995) (citing *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Generally, the equal protection clause has been "concerned with governmental 'classifications that affect some groups of citizens differently than others.'" *Engquist v. Or. Dep't of Agric.*, 533 U.S. 591, 601 (2008). However, "[i]t is axiomatic that racial classifications do not become legitimate on the assumption that all persons suffer them in equal degree." *Powers v. Ohio*, 499 U.S. 400, 410 (1991). Racial classifications are analyzed under strict scrutiny. *See, e.g., Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). "Strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003). "The purpose of the test is to ensure that the government's choice to use racial classifications is justified, not to ensure that the contours of the specific racial classification that the government chooses to use are in every particular correct." *Jana-Rock Constr. Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 210 (2d Cir. 2006). Under this standard, the government has the burden of proving that racial classifications "are narrowly tailored measures that further compelling governmental interests." *Id*.

C. **Application**

As discussed above, the court has already considered plaintiff's as-applied

---

*Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008).

challenge to the DOCS policies, and that claim has been dismissed. In my Report-Recommendation recommending dismissal, I explained that the denial of plaintiff's request to double cell with Cardew was based on security concerns as Cardew had an extensive disciplinary history and several placements in protective custody. Dkt. No. 133 at 27. Plaintiff did not allege that inmates were only housed with inmates sharing the same ethnic and religious background, and therefore, plaintiff failed to state a plausible claim that the DOCS housing policies were applied against him in a discriminatory manner, and his "as applied" challenge was dismissed.

Because plaintiff cannot establish an "as applied" challenge, he has also failed to state a facial challenge to the policy. The court has already held that the policy was applied constitutionally to him–there is, therefore, a circumstance under which the policy could be valid.[7] *See United States v. Decastro*, 682 F.3d 160, 163 (2d Cir. 2012) ("[A] defendant who fails to demonstrate that a challenged law is unconstitutional as applied to him has 'necessarily fail[ed] to state a facial challenge, which requires [him] to establish that no set of circumstances exists under which the statute would be valid.'") (alterations in original) (quoting *Diaz v. Paterson*, 547 F.3d 88, 101 (2d Cir. 2008)); *see also Chavad Lubavitch of Litchfield County, Inc. v.*

---

[7] Defendants argue that plaintiff does not have standing to bring a facial challenge and cite *Shabazz v. Cuomo*, No. 93 Civ. 7692, 1998 WL 102050 (S.D.N.Y. Mar. 5, 1998), in support of their argument. However, the *Shabazz* court first found that plaintiff did not have standing to assert an as-applied claim that the change in policy violated the First Amendment and *then* considered the facial challenge, noting that "a plaintiff who does not have standing to challenge a regulation as applied to him ordinarily does not have standing to assert a facial challenge to the same regulation." *Id.* at *3. Here, the court did not hold that plaintiff did not have standing to bring an as-applied challenge, only that there was not a constitutional violation. *See* Dkt. No. 133 at 27.

8

*Borough of Litchfield*, 796 F. Supp. 2d 333, 340 (D. Conn. 2011) (explaining that "in light of the fact that the Second Circuit identified a circumstance in which [the statute] was constitutional as applied, the statute is necessarily constitutional on its face").

## IV. Qualified Immunity

### A. Legal Standards

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc. v. Abromaitis*, 294 F.3d 355, 360 (2d Cir. 2002) (citations omitted). Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir. 1990).

In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendants'] conduct violated a constitutional

9

right." *Saucier v. Katz*, 553 U.S. 194, 201 (2001), modified by *Pearson v. Callahan*, 555 U.S. 223, 224 (2009) (holding that, "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory in all cases"). The court may also examine "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. However, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

    B.    **Application**

This court need not address qualified immunity with respect to plaintiff's claim because, as discussed above, plaintiff has not established a violation of his constitutional rights. However, even if plaintiff had raised some material issue of fact relating to his facial challenge to the DOCS policy, the defendants are still entitled to summary judgment and dismissal of plaintiff's claim for money damages on the grounds of qualified immunity.

In *Johnson v. California*, 543 U.S. 499 (2005), the Supreme Court addressed an unwritten policy of the California Department of Corrections ("CDC") of racially segregating prisoners in double cells for a period of time when they entered a new correctional facility. The Supreme Court held that the Californian CDC policy was subject to strict scrutiny because it was an express racial classification, and remanded the case for analysis under that standard. *Id.* at 505-06. In *Johnson*, as in this case (*see* Leclaire Decl. ¶ 19), the double cell assignment policy purportedly served the

interests of prison safety and security. The *Johnson* court stated that "[t]he 'necessities of prison security and discipline,' are a compelling government interest justifying only those uses of race that are narrowly tailored to address those necessities." *Id.* at 512 (citation omitted). It appears the *Johnson* case was somehow resolved before the California CDC policy was evaluated under strict scrutiny on remand, as there is no subsequent reported decision in that case.

Although defendants in *Johnson* claimed that double-cell assignments in the California CDC were based on a number of factors, "the CDC has admitted that the chances of an inmate being assigned a cellmate of another race are [p]retty close to zero percent." *Johnson*, 543 U.S. at 502 (citation and internal quotation marks omitted). The New York DOCS policy at issue here lists ethnicity as one of the many factors used to determine whether inmates may be assigned as cell mates; but race is not the sole factor, and it is not necessarily determinative. Indeed, the DOCS policy explicitly provides that "[i]t is not necessary [] that [the two] inmates share the same ethnic or religious background." (Leclaire Dec., Ex. A at 4). *See Johnson*, 543 U.S. at 509, n.2 (distinguishing the California policy, under which inmates of different races have "close to no chance" of being placed in a double cell, from similar policies in Oklahoma and Texas, noting that there, the inmates "are not precluded from integrated cell assignments" and that to the extent race is one factor considered, individualized consideration is given to all inmates) (citations omitted).

The DOCS policy at issue here explicitly provides for individualized consideration of each request, and it requires the evaluation of a variety of factors.

11

Defendant Leclaire has explained that the various suitability factors are applied using "some degree of judgment and discretion," and the individuals making the decision "usually have decades of experience in the corrections field, and are experienced in evaluating inmate behavior." (Leclaire Decl. ¶ 14). He further explained that the compatibility factors are "set out as guidance" and "if there is a specific reason to believe that an inmate is unable to get along with or has a history of conflict with inmates of a specific background," they would not be housed together. (Leclaire Decl. ¶ 16).

There is no allegation in this case that DOCS inmates of different ethnicities and/or religions are never housed together. Similarly, defendant Leclaire explained that during his tenure as Deputy Commissioner, he "saw no evidence that the policy was being used to segregate inmates by race, ethnicity, or religious affiliation" and, indeed, "is aware that inmates of different races, ethnicities, and/or religions were double-celled together throughout the New York State Correctional System." (Leclaire Decl. ¶ 20). Additionally, the court notes that the stated reason for not placing plaintiff in a cell with Cardew was Cardew's "extensive disciplinary history and several placements in protective custody," (Dkt. No. 133 at 27)–not ethnicity or religion.

It may be that, after *Johnson*, that it was well established that policies requiring *de facto* segregation of the races in prisons violate the Fourteenth Amendment. It was not, however, clear, at the time of the conduct in this case, that the Equal Protection Clause protected prisoners from having their race used as one of many factors applied

12

on an individualized basis, for security purposes, in assigning cellmates. It was objectively reasonable for the defendants to believe that the DOCS policy regarding double occupancy housing assignments was not a violation of the Equal Protection clause. Accordingly, the defendants in this case would have qualified immunity with respect to any claim for damages based on plaintiff's Equal Protection challenge to the DOCS double cell assignment policies.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 158) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY AS TO ALL DEFENDANTS**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: March 5, 2014

**Andrew T. Baxter**
**U.S. Magistrate Judge**

13